UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER LEE-MURRAY BEY,

     Plaintiff,

                                Case No. 14-13743

v.

                                HONORABLE DENISE PAGE HOOD

ADAM FALK, CANTON CHARTER
TOWNSHIP, CITY OF LIVONIA,
ANDREW McKINLEY, ERIC
EISENBEIS, and MEGAN McATEER,

     Defendants.

_____/

**ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [#38, 39]**

## I.    INTRODUCTION

Plaintiff Christopher Lee-Murray Bey filed this 42 U.S.C. § 1983 action on September 29, 2014, alleging that Defendants violated his constitutional rights when they illegally stopped and seized him. On June 28, 2016, Defendants City of Livonia ("Livonia"), Andrew McKinley ("McKinley"), Eric Eisenbeis ("Eisenbeis"), and Megan McAteer ("McAteer") filed a Motion for Summary Judgment [Dkt. No. 38], and Defendants Charter Township of Canton ("Canton") and Adam Falk ("Falk") filed a Motion for Summary Judgment. [Dkt. No. 39] Both motions have been fully briefed. The Court held a hearing on the motions on November 9, 2016.

1

For the reasons that follow, the Court denies in part and grants in part the Motion for Summary Judgment filed by Livonia, McKinley, Eisenbeis, and McAteer and denies in part and grants in part the Motion for Summary Judgment filed by Canton and Falk.

## II.    BACKGROUND

On March 16, 2013, sometime after midnight, 26-year old Plaintiff Christopher Bey and his friends, 23-year old DeAires Freeman and 19-year old Devon Burt drove to a Meijer Department Store in the City of Livonia to buy a portable space heater. (Dkt. No. 46, Ex. A at 6, 25-26, 29; Dkt. No. 46, Ex. B at 14, 24, 31; Dkt. No. 46, Ex. C at 19-20)  The weather was cold but clear. (Dkt. No. 46, Ex. D at 50) They drove together in Plaintiff's newly purchased 2000 Plymouth Grand Voyager that had a valid pink temporary license tag prominently displayed. (Dkt. No. 46, Ex. A at 38, 53) All three men are black.

The three men went to the Meijer at I-96 and Middlebelt in Livonia but were unable to locate a suitable heater. (Dkt. No. 46, Ex. A at 46-47) They left the store and drove to a Walmart directly across the street, only to find that it was closed. (Dkt. No. 46, Ex. A at 49, 265-267; Dkt. No. 46, Ex. D at 15-17, 36 ) They remained in the parking lot for a few minutes while Plaintiff used his cell phone and located another 24-hour Walmart that was open in the area. (Dkt. No. 46, Ex. B at 31-32)  They then

2

drove to the Canton Walmart.

At the Canton Walmart, the three men walked into the store, got a shopping cart and headed towards the back of the store. Freeman looked at a BB gun in the sporting good section. (Dkt. No. 46, Ex. C at 26)  Plaintiff found two portable heaters, placed them in his cart and proceeded to check-out. (Dkt. No. 46, Ex. A at 50, 68) Plaintiff took out his wallet, handed one credit card to the cashier and completed his purchase. (Dkt. No. 46, Ex. A at 51-52; Dkt. No. 46, Ex. E at 4)  The three men left the store and walked backed to the Minivan. (Dkt. No. 46, Ex. A at 52) Plaintiff got in the rear driver's side seat, fastened his seat belt and closed the door. (Dkt. No. 46, Ex. A at 69; Dkt. No. 46, Ex. B at 33, 35)

At least three police cars immediately surrounded the Minivan "like something out of SWAT." (Dkt. No. 46, Ex. A at 55-56, 184; Dkt. No. 46, Ex. F at 38-39; Dkt. No. 46, Ex. C at 34-35, 66; Dkt. No. 46, Ex. B at 34-35)  Falk, a white uniformed Canton Township police officer, approached Plaintiff and ordered him to "Get out of the car." (Dkt. No. 46, Ex. A at 58, 63; Dkt. No. 46, Ex. F at 25-26, 36-37, 40; Dkt. No. 46, Ex. G at 11)  Plaintiff obeyed the command and exited the vehicle. (*Id*.) For his safety and that of the officers, Plaintiff told Falk he had a handgun and pointed to his right hip where it was holstered. (Dkt. No. 46, Ex. A at 59; Dkt. No. 46, Ex. F at 40-41, 44)  Falk confiscated the weapon.  Falk told Plaintiff "we were investigating

3

a possible retail fraud or credit card fraud that had happened in the store." (Dkt. No. 46, Ex. F at 45)  Plaintiff produced a sales receipt and Falk "was satisfied at that point that they had not committed retail fraud—or credit card fraud[.]" (Dkt. No. 46, Ex. A at 61, 71-72; Dkt. No. 46, Ex. F at 46)  Plaintiff handed Falk his Concealed Weapons Permit License ("CPL"). (Dkt. No. 46, Ex. A at 188; Dkt. No. 46, Ex. F at 49) Falk had Canton dispatch run the CPL and discovered it had expired. He then arrested Plaintiff for unlawful carrying of a concealed weapon. (Dkt. No. 46, Ex. A at 70-71, 82, 109; Dkt. No. 46, Ex. F at 47)

During the foregoing events, Plaintiff, Freeman, and Burt had been under surveillance by Livonia Police Department's plain clothes Special Operations Unit ("SOU"). (Dkt. No. 46, Ex. H at 46; Dkt. No. 46, Ex. D at 8-9)  The four-member SOU consisted of McKinley, Eisenbeis, McAteer (collectively, the "SOU officers") and Officer Richard Ostrowski, all of whom are white. (Dkt. No. 46, Ex. I; Dkt. No. 46, Ex. H at 7; Dkt. No. 46, Ex. J at 16)  McKinley was the Officer in Charge. (Dkt. No. 46, Ex. J at 7-8)  Surveillance began when McKinley saw a "beat up" minivan travelling southbound on Middlebelt Road in Livonia. (Dkt. No. 46, Ex. J at 17, 51) The vehicle "wasn't speeding or driving in a manner that would raise any suspicion." (Dkt. No. 46, Ex. J at 17)  Upon seeing the minivan, McKinley made a U-turn and began to follow based on a "hunch." (Dkt. No. 46, Ex. J at 54)

McKinley noticed the minivan had a temporary license plate (Dkt. No. 46, Ex. D at 9) and watched the vehicle "occupied by three black males" turn into the Livonia Meijer parking lot. (Dkt. No. 46, Ex. E at 3; Dkt. No. 46, Ex. J at 17, 52-53)  There was nothing unusual about where or how the minivan parked. (Dkt. No. 46, Ex. J at 20)  SOU watched the three men enter the store. (Dkt. No. 46, Ex. E at 3)

McKinley purportedly called Livonia dispatch, who ran the temporary plate through the Law Enforcement Information Network ("LEIN") but was not "able to verify it." (Dkt. No. 46, Ex. F at 55; Dkt. No. 46, Ex. J at 18)  The officers acknowledge that LEIN was not reliable for recent vehicle transactions because it may take days before a vehicle is entered into the LEIN system. (Dkt. No. 46, Ex. J at 54; Dkt. No. 46, Ex. H at 44-45; Dkt. No. 46, Ex. D at 57, 63)  McKinley decided not to stop the minivan because "they hadn't done anything wrong. I mean we were just watching them" just in case "something else should happen to occur." (Dkt. No. 46, Ex. J at 18)

The SOU left the Meijer lot for a short period to attend to "something else going on at the city at the time." (Dkt. No. 46, Ex. J at 17, 21)  When they returned, the minivan was still parked in the well-lit lot and surveillance reestablished. (Dkt. No. 46, Ex. J at 21-22)  The officers had no information that the three men had engaged in any unlawful conduct inside the store. (Dkt. No. 46, Ex. J at 21-22, 25)

5

The officers next saw Plaintiff and his friends drive from the Meijer lot to a Walmart directly across the street, but that Walmart was closed. (Dkt. No. 46, Ex. J at 23)  The minivan remained in the lot for a few minutes before: (a) heading west on I-96 to northbound I-275, (b) exiting at Six Mile Road (the first exit), (c) getting back on southbound I-275, (d) exiting at Ford Road, and (e) parking in the Canton Walmart parking lot. (Dkt. No. 46, Ex. J at 23; Dkt. No. 46, Ex. D at 22, 36-37; Dkt. No. 46, Ex. E at 3)[1]  The SOU officers followed the minivan in a caravan of four unmarked vehicles. (Dkt. No. 38, Ex. I)  McKinley ordered McAteer to go into the store "to keep walking surveillance on the subjects." (Dkt. No. 46, Ex. E at 4)

McAteer used her cell phone to relay what she saw to McKinley. (Dkt. No. 46, Ex. H at 27; Dkt. No. 46, Ex. J at 33-34, 37-38)  She noticed one subject in "the hunting section inquiring about guns." (Dkt. No. 46, Ex. H at 20-21, 29-31; Dkt. No. 46, Ex. D at 24; Dkt. No. 46, Ex. J at 29-30)  She saw the three men go to the electronics department where "nothing in particular stands out." (Dkt. No. 46, Ex. H at 22)  McAteer saw the subjects place items in their shopping cart. (Dkt. No. 46, Ex.

---

[1]Eisenbeis had no explanation for why his written report stated that the minivan was "making turns for no reason." (Dkt. No. 46, Ex. E at pg 3.) He claimed that when Plaintiff missed an exit and immediately returned to the freeway, it was a "cleaning move" designed to shake a tailing police vehicle. (Dkt. No. 46, Ex. D at 37-38.) Eisenbeis admitted that the minivan did not drive through any residential neighborhoods. (Dkt. No. 46, Ex. D at 31.) It is undisputed that the minivan did not dim it lights, drive at an excessive rate of speed or attempt to conceal its presence.

H at 23)  She noticed nothing unusual as they made their way to the cashier. (Dkt. No. 46, Ex. H at 24-25)   McAteer was watching for a "push-out." (Dkt. No. 46, Ex. H at 31)  McKinley explained that a "push-out" is when a subject fills a shopping cart with merchandise and runs it past the cashier and out the door. (Dkt. No. 46, Ex. H at 26-27, 31; Dkt. No. 46, Ex. J at 57, 64; Dkt. No. 46, Ex. F at 26-27, 36)  There was no push-out. (Dkt. No. 46, Ex. J at 64)

At the checkout register, McAteer saw one of the "subjects" "flipping through some cards to, you know, pick a card." (Dkt. No. 46, Ex. H at 26, 31-32, 34-37; Dkt. No. 46, Ex. D at 25; Dkt. No. 46, Ex. J at 38)  She reported that one of the young men selected a single card from others, handed it to the cashier and paid for the merchandise without incident. (Dkt. No. 46, Ex. H at 26, 31-32, 34-37, 39; Dkt. No. 46, Ex. D at 25; Dkt. No. 46, Ex. J at 38; Dkt. No. 46, Ex. E at 4)  McAteer saw no evidence of any crime. (Dkt. No. 46, Ex. H at 31, 34)  McKinley also knew that the three young black men had "absolutely not" committed a crime in Livonia or Canton. (Dkt. No. 46, Ex. J at 46-47)

McKinley had the Canton police stop the three young men "to make contact and identify these people." (Dkt. No. 46, Ex. J at 42)  McKinley explained his intent: "Well, we could get identification. That was our first intent, to get these people identified. You know, maybe they're part of a crew. This could be intelligence that we

7

could use later through identification. Maybe they were involved in something in another city and, you know, information sharing." (Dkt. No. 46, Ex. J at 43, 45)[2] McKinley explained that the secondary purpose for the stop was to get an "explanation" why they were shopping. (Dkt. No. 46, Ex. J at 44)[3]

Prior to or upon arriving at the Canton Walmart, McKinley phoned a friend who worked for the Canton Police Department "and gave them an overview of what we had in Livonia and how it came to Canton, you know.  So they would have a history

---

[2]McKinley testified:

Q.  Okay. You mentioned getting information about a database or sharing information that you may get from the stop.
A.  Yes.
Q.  Explain that to me. I don't do police work and I'm not in your profession. Explain that to me.
A.  Well, let's say you have a contractor come to your house and he's going to do some kitchen work. You would share it with other friends. I put that in police work. This might be a retail fraud crew. This might be a credit card fraud crew which is rampant right now and by identifying these people, they could be—we could do information sharing through different departments and that might shore up if, in fact, these guys are involved in something of that nature, could shore up a case in Canton, in Redford, Farmington Hills or it could be nothing. But you know, sharing that information could be useful and productive, you know, in the law enforcement realm.

(Dkt. No. 46, Ex. J at 45.)

[3]McKinley explained:

You know, maybe just where are they coming from, where they're going, are they shopping, what are they doing to kind of maybe paint us a picture if this is something we should be concerned with or if it's nothing and we'll move on, having just a conversation, conducting a roadside investigation.

*Id*. at 44.

8

of what occurred." (Dkt. No. 46, Ex. J at 33)  While en route to the Canton store Falk was "advised [Livonia police] were following three black males inside the Canton store that they had been watching at one of their Livonia Walmart stores" and were "shopping around." (Dkt. No. 38, Ex. K at 4; Dkt. No. 39, Ex. G at 11;[4] Dkt. No. 46, Ex. D at 29; Dkt. No. 38, Ex. I) Upon meeting the SOU officers at the Canton Walmart, Falk was given a Livonia prep radio "so [he] can kind of hear what's going on through me—through Megan [McAteer], through me and then through the police radio." (Dkt. No. 46, Ex. J at 32; Dkt. No. 46, Ex. F at 13, 33-34)

Falk was completely reliant on his "law enforcement intuition" and the little information received from the SOU. (Dkt. No. 46, Ex. F at 22, 58, 61)  Falk assumed that "[t]here's a reason why they're following these subjects around at this time of night, they're probably doing retail fraud." (Dkt. No. 46, Ex. F at 22, 32, 41)  Falk had no information that Plaintiff and his friends and done anything illegal. (Dkt. No. 46, Ex. F at 34-36)  He simply "assumed" that "there's a possibility of credit card fraud." (Dkt. No. 46, Ex. F at 36)

Three marked Canton police cars surrounded the minivan in the parking lot,

---

[4]This conflicts with Falk's deposition testimony that he first learned that Plaintiff and his friends were black when he was given the prep-radio. (Dkt. No. 46, Ex. G at 66) The audio of radio contact between McKinley and Canton dispatch – and between Canton dispatch and Falk) includes no reference to the race of the van occupants. (Dkt. No. 46, Ex. F) In any event, Falk was aware that Plaintiff and his friends no later than when he arrived at the Canton Walmart and was given a police radio.

with the four unmarked vehicles staged by the SOU officers nearby. This was not a traffic stop. (Dkt. No. 46, Ex. F at 63, 77.) The three young men were not free to leave. (*Id*.) Falk immediately ordered Plaintiff out of the vehicle. (Dkt. No. 46, Ex G at 40) Plaintiff obediently complied. He exited the vehicle and told Falk that he was armed and gave the officer his CPL. Falk had Canton run the CPL and discovered that it was expired. (Dkt. No. 38, Ex. I)  Plaintiff was arrested and placed in the backseat of Falk's cruiser – but no seatbelt was utilized for Plaintiff. (Dkt. No. 38, Ex. K at 5) On the ride to the Canton station, Plaintiff struck his head and began seeing stars. (Dkt. No. 38, Ex. K at 5)

Plaintiff was charged in Wayne County Circuit Court with a felony of carrying a concealed weapon. (Dkt. No. 46, Ex. K)  Plaintiff filed a motion to suppress because the seizure was unreasonable and violated his Fourth Amendment rights.  At the suppression hearing, Falk was unable to identify any suspicious activity to justify the stop. (Dkt. No. 46, Ex. G at 12-16)  Falk testified that Plaintiff engaged in suspicious activity at the Livonia Walmart by walking with a shopping cart, looking at items but not buying anything. (*Id*. at 14-15.)  Falk testified that while in Canton "I did not have any suspicious activity." (*Id*. at 17.)  At that point the circuit court judge stated:

> THE COURT: I'm thinking we're in Russia or something. I'm not sure what's going on here. I don't know what's going on here. I don't even know why you have any more questions. This is a no-brainer.  The Court is going to suppress the evidence.

The Court would find that there was absolutely no reason in the world to stop these people. In other words, I was waiting for you to say that they left the store without paying or something. I don't know what they did.  You said, Livonia said they didn't do anything illegal. That they were acting suspicious.  I mean I must have committed a hundred of those suspicious - - I go in stores all the time and push stuff around and leave a buggy with stuff in it. I've even left perishable items in the buggy. That's probably a crime. Didn't do anything wrong.

I am shocked - - with all due respect, Officer - - that you actually stopped these - - this person, because of some suspicious activity.  If they paid for the items in the buggy and then walked out, why would you question them? That made no sense to me.  And I'm not here to ask you a question. I'm here - - based on the testimony that I've heard there was absolutely no reason to stop them, other than curiosity to see if they maybe did something wrong or if they had some - - excuse me - - if they had some contraband or a firearm on them. Other than that, there was no reason to stop them. There was no reason to question them, especially this individual.

I don't know if - - I was waiting for the smoking gun. There's nothing.  So there was no reason to question this individual or stop him, and the Court's going to suppress the evidence.

*Id*. at 18-19. The Wayne County Circuit Court dismissed that case, with prejudice.

(Dkt. No. 46, Exs. L and M.) The prosecutor did not appeal.

## III.   APPLICABLE LAW

### A.   Rule 56

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

11

P. 56(a).   The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex Corp.*, 477 U.S. at 322-23.  A court must look to the substantive law to identify which facts are material.  *Anderson*, 477 U.S. at 248.

## B.    Qualified Immunity

As recently stated by the Supreme Court:

> The doctrine of qualified immunity shields officials from civil liability
> so long as their conduct does not violate clearly established statutory
> or constitutional rights of which a reasonable person would have
> known. A clearly established right is one that is sufficiently clear that
> every reasonable official would have understood that what he is doing
> violates that right. We do not require a case directly on point, but
> existing precedent must have placed the statutory or constitutional
> question beyond debate. Put simply, qualified immunity protects all
> but the plainly incompetent or those who knowingly violate the law.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted).

Qualified immunity is a two-step process. *Saucier v. Katz*, 533 U.S. 194 (2001). First, the Court determines whether, based upon the applicable law, the facts viewed in a light most favorable to the plaintiff show that a constitutional violation has occurred. Second, the Court considers whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Saucier v. Katz, supra.*; *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005). Only if the undisputed facts, or the evidence viewed in a light most favorable to the plaintiff fail to establish a prima facie violation of clear constitutional law can this court find that the Defendants are entitled to qualified immunity. *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).

Once a government official has raised the defense of qualified immunity, the plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (citation omitted). A plaintiff must also establish that each

13

individual defendant was "personally involved" in the specific constitutional violation. *See Salehphour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998); *Bennett v. Schroeder*, 99 F. App'x 707, 712-13 (6th Cir. 2004) (unpublished) ("It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must allege some personal involvement by the each of the named defendants").

## IV.   ANALYSIS

Plaintiff alleges that Defendants violated: (1) his Fourth Amendment rights when they seized him without legal justification; and (2) his Fourteenth Amendment equal protection rights because he was targeted, scrutinized, and stopped because of his race.  Defendants assert that they had reasonable suspicion to stop Plaintiff and that race was not a factor in their decision to follow or seize Plaintiff.

Defendants devote some of their argument to the issue of probable cause for arresting Plaintiff for carrying a concealed weapon.  Those arguments ignore that Plaintiff does not challenge whether there was probable cause for the arrest; rather, Plaintiff challenges whether there was a legal basis for the stop and seizure in the first place.  As those arguments are irrelevant, the Court does not analyze them.

### A.   Fourth Amendment Claims

Under the Fourth Amendment, law enforcement officer may initiate a conversation with a citizen without implicating Fourth Amendment rights. *United*

14

*States v. Mendenhall*, 446 U.S. 544, 553-54 (1980). An investigatory (*Terry*) stop or detention requires that the officer has reasonable suspicion that a crime may have occurred. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). *See also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30) (reasonable suspicion that a crime "may be afoot" will support a lawful investigatory stop). The officer must possess "a particularized and objective basis for suspecting the particular person . . . of criminal activity" based on "specific and articulable facts." *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006) (internal citations omitted).

The reasonable suspicion "must be supported by specific and articulable facts that would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 88 (internal quotations and citation omitted). Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a Terry stop." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak*, 460 F.3d at 778-79).

In *U.S. v. Arvizu*, 534 U.S. 266, 273-274 (2002), the Supreme Court stated:

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at

15

the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *See, e.g.*, [*United States v. Cortez*, 499 U.S. 411, 417–18 (1981)]. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Id.*, at 418. *See also Ornelas v. United States*, 517 U.S. 690, 699 (1996).

"The court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . after the fact." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)(citing *U.S. v. Cortez*, 449 U.S. 411, 418 (1981)).

### 1.   SOU Officers

This case turns on one's viewpoint.  All parties agree that the issue is whether there was probable cause or reasonable suspicion to make the traffic stop.  Plaintiff argues that he did not, at any point, engage in any criminal activity prior to being stopped by Falk.  As discussed below, the facts and the acknowledgments and admissions of the SOU officers support that finding.

There is one thing that could have justified a traffic stop, but it was a civil infraction and the evidence is uncontroverted that it was not a basis for stopping Plaintiff's minivan.  It is undisputed that Plaintiff's minivan had a temporary plate on

16

it because he had purchased the vehicle only days earlier.  Police may effect a traffic stop if they have probable cause to believe a person has committed a civil infraction or reasonable suspicion of criminal activity. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).  M.C.L.  257.225 requires a motor vehicle to be properly registered and plated before it may be driven lawfully.

The testimony of McKinley is that he caused the plates to be run through LEIN and the result was "no record." Defendants contend that, from the time when they learned the minivan had a "no record" result on the temporary plate, they had probable cause to believe a violation of M.C.L. 257.225 had occurred.  But, according to McKinley, Plaintiff's minivan was not stopped in Livonia because "they hadn't done anything wrong," (Dkt. No. 38, Ex. E at 18) and Defendants have offered no evidence (other than McKinley's claim) that the temporary plate was run through LEIN and that a "no report" result was obtained.  For that reasons and because the stop of Plaintiff's minivan did not occur until after an extended period of time passed and the minivan's occupants had stopped and shopped at a Meijer in Livonia, stopped at a closed Walmart across the street from Meijer, and driven to and shopped at a Walmart in Canton, a reasonable fact finder could determine that the purported "no report" result was nothing more than a made up reason for a stop.

Although Defendants argue they could have stopped the minivan at any time

for this suspected civil infraction, they never effectuated a stop on that basis. Instead,

Defendants observed all of the following events, and Defendants maintain that their

experience and training led them to the conclusion that criminal activity may be afoot.

A. There had been a rash of electronics and cell-phone store break-ins in Livonia in the time preceding March 2014, which was a reason (or one of the reasons) for the SOU unit. (Dkt. No. 38, PgID 286, Ex. E at 52)

B. Criminals utilize vehicles with stolen or inaccurate plates to avoid identification and a "no record" vehicle, especially an older model such as Plaintiff's minivan, is suspicious. (Dkt. No. 38, Ex. E at 53-54)

C. Stores are understaffed late at night, making it an opportune time for criminals to go from store to store checking out security and situations to exploit. (Dkt. No. 38, Ex. G at 33)

D. Plaintiff's minivan was parked in the lot of the Livonia Walmart for "an extended period of time" when the store was closed, which was "suspicious" because it could indicate that the occupants were discussing strategy related to where they had been or were going. (Dkt. No. 38, Ex. E at 23-24, 60-61 and Ex. F at 16)

E. Plaintiff's minivan went north on I-275, took the first exit, and then headed south on I-275, which is a recognized method of trying to discover or lose law enforcement tails – known as a "cleaning move." (Dkt. No. 38, Ex. E at 60-61)

F. When the merchandise was purchased at the Canton Walmart, the buyer shuffled through numerous cards before paying, which might indicate credit or gift card fraud. (Dkt. No. 38, Ex. E at 58-59 and Ex. G at 34)

G. The weather was, according to some Defendants, inclement. (Dkt. No. 38, PgID 287; Dkt. No. 50, PgID 1408; Dkt. No. 50, Ex. G at 24)

Defendants contend that the SOU officers, based on the totality of these

circumstances and drawing on their experiences and training, had reason to believe (reasonable suspicion) that underlined criminal activity may have been afoot in the evening/early morning hours when they Plaintiff. Relying on *Arvizu*, 534 U.S. at 273-74 (quoting *Cortez*, 499 U.S. at 418) ("officers [are allowed] to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"). (Dkt. No. 38, Ex. E at 62)

Plaintiff notes that there is abundant evidence that Defendants did not have probable cause.  First, Defendants have acknowledge that "all of the items, taken individually, might well be completely innocent or bereft of a distinct criminal behavior." (Dkt. No. 38, PgID 288)  Second, McKinley testified that when Plaintiff left the Canton Walmart, he knew that neither Plaintiff nor his friends had committed a crime. (Dkt. No. 38, Ex. E at 46-47)  Third, Defendants have not offered any evidence that the break-ins involved any locations or similar types of stores Plaintiff traveled on the evening of his arrest.

Fourth, it is not illegal to drive an older vehicle or have a temporary plate on it. Fifth, it is not unusual to shop at 2:00 a.m. at a 24-hour store, as that is the very purpose of such stores—to be open all the time.  Sixth, it is not suspicious to travel from store to store looking for an item – or to miss an exit on the expressway and then

take corrective action to go in the direction intended.  Seventh, there is no evidence that there was anything suspicious about putting merchandise in the cart at the Canton Walmart and paying for it with a credit card, especially as there is no evidence that multiple credit cards were used while checking out of the Canton Walmart.

Plaintiff contends that such events, whether viewed individually or collectively, do not amount to an objectively reasonable suspicion to support an investigatory stop. Citing *United States v. Fuller*, 120 F.Supp.3d 669, 679 (E.D. Mich. 2015) (citing *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994).  It is clear that the Wayne County Circuit judge presiding over Plaintiff's motion to suppress hearing agreed, stating that "there was absolutely no reason in the world to stop" and "no reason to question" Plaintiff before granting the motion to dismiss. (Dkt. No. 46, Ex. G at 18-19)

The Court concludes that there is a genuine dispute of material fact that, even if Defendants had a reason to believe Plaintiff and his friends were engaged in suspicious activity, that reasonable suspicion evaporated when McAteer watched them put the items in their cart – and pay for those items with a single credit card – before leaving the Canton Walmart.  The officers involved, including McKinley and  Falk, were aware of those facts.  At that point, Defendants knew that Plaintiff and his friends had not committed a crime in Livonia or Canton. (Dkt. No. 46, Ex. J at 46-47)

20

McKinley's testimony that the purpose of stopping (seizing) Plaintiff and his friends was to gather information, not due to reasonable suspicion of criminal activity afoot further supports the existence of a question of fact whether there was a valid basis for reasonable suspicion to justify the stop:

> You know, maybe just where are they coming from, where they're going, are they shopping, what are they doing to kind of maybe paint us a picture if this is something we should be concerned with or if it's nothing and we'll move on, having just a conversation, conducting a roadside investigation.

(Dkt. No. 46, Ex. J at 44) As Plaintiff asserts, gathering intelligence for law enforcement and demanding an explanation for why they were shopping does not constitute a constitutionally permissible reason to make a *Terry* stop. *United States v. Pruitt*, 174 F.3d 1215, 1221 (11th Cir. 1999).

Defendants argue that, if the Fourth Amendment claims are viable against the SOU officers, the claims against McAteer and Eisenbeis should be dismissed because McKinley alone made the decisions to contact the Canton Township Police Department and to have Falk make contact with Plaintiff. The Court disagrees. McAteer and Eisenbies were present throughout the events. McAteer was inside the Canton Walmart conducting surveillance on Plaintiff and his friends and giving the other officers a play-by-play of what was occurring inside the Walmart, including descriptions – if not comments – suggesting that a "pushout" or other retail fraud and

21

credit card fraud – was possible, even likely.  Eisenbeis drafted a police report that indicates that the dispatched offense, the subject and the verified offense were "Suspicious Circumstances" but does not contain any criminal activity committed by Plaintiff or his friends – except for the possession of the firearm by Plaintiff discovered after the stop.

The Court finds that there is a genuine dispute of material fact as to whether Plaintiff's Fourth Amendment rights were violated by the SOU officers.

2.   *Falk*

Falk contends that he had reasonable suspicion to stop Plaintiff because:

[B]ased on the facts and circumstances known to Officer Falk at the time he approached Plaintiff's vehicle as well as the inferences that he drew from that information given his experience as a law enforcement officer, there is no doubt that he had reasonable suspicion to stop Plaintiff. Those articulable facts included: that the request for Officer Falk to make contact was by the Livonia SOU, which he knew was highly trained in surveillance and crime prevention (Ex. G, pp. 13-14); that it was between 2:00 and 3:00 a.m., a time when retail stores are understaffed and a time where individuals generally do not travel from store to store (Id. at 20, 33); that the weather was "horrible," which typically deters motorists from being out on the roads (Id. at 24, 43); that Plaintiff and his friends had traveled to stores in Livonia and were now inside the Canton Walmart (Ex. G, pp. 11-12, 31-33, 52; Ex. F); that the Livonia SOU suspected that Plaintiff was trying to commit a retail fraud inside the Canton Walmart (Ex. G, pp. 26-27; 35-36); that Plaintiff was driving a van with a temporary tag that was not registered (Id. at 42, 53, 55) [Falk argues that this alone provided reasonable suspicion to perform an investigatory stop]; that Plaintiff and his companions were in the gun section of the Canton Walmart, which is not typically staffed at that time of night (Id. at 26, 34); that Plaintiff and his friends were in the

22

electronic section of the store (Ex. H, pp. 20-22, 28); that the SOU suspected the men were going to do a "push out" initially (Ex. G, pp. 26-27); that Plaintiff got in line and was cycling through several credit cards, which is characteristic of credit card or financial transaction fraud (Ex. G pp. 27, 35-36; Ex. B, pp. 58-59, 61-63; Ex. H, pp. 25, 27). All of these things, in their totality, certainly gave Officer Falk the reasonable suspicion necessary to approach the vehicle and conduct an investigatory stop.

(Dkt. No. 39, PgID 541)

Falk asserts that he was justified in relying upon the SOU officers who had investigated Plaintiff and his friends (the "collective knowledge doctrine") – and was instructed by McKinley to make contact with Plaintiff when he left the Canton Walmart. Relying on *Hardesty v. Hamburg Twp.*, 461 F.3d 646 (6th Cir. 2006). In *Hardesty*, the court dismissed a cause of action against Pinckney officers who, upon arriving on the scene of criminal activity, were told to go into the home by Hamburg officers, even though the entry was without a warrant. The court stated,

Reliance upon such information insulates the Pinckney officers from civil liability in the event the information relied upon was defective. . . . Therefore, even if the Hamburg officers had violated the Fourth Amendment in the course of learning of the apparent emergency, the Pinckney officers' entry into the house based on that information would not subject the Pinckney officers to [Section] 1983 liability.

*Id.* at 656. *See also United States v. Duval*, 742 F.3d 246, 253-54 (6th Cir.), *cert. denied*, 135 S.Ct. 116 (2014) ("the collective knowledge of agents working as a team is to be considered together in determining probable cause."). *See also Lyons*, 687

23

F.3d at 768-70 (citations omitted):

> The record demonstrates that the troopers were not acting on their own initiative when they stopped Defendant. The troopers testified that they had no independent basis to target the minivan; rather they did so solely based on Agent Graber's request. . . . The troopers possessed all the information they needed to act – a request by the DEA (subsequently found to be well-supported) that they execute the traffic stop . . . Responding officers are entitled to presume the accuracy of the information furnished to them by other law enforcement personnel. They are also entitled to rely upon the investigating officer's representations of reasonable suspicion, and to the extent applicable, whatever exigent circumstances are claimed to support a stop."

Plaintiff counters that Falk, because he relied on the SOU officers to stop and seize Plaintiff – and because he had knowledge of what was occurring in the Canton Walmart, lacked reasonable suspicion to stop Plaintiff for the same reasons the SOU officers did. The Court agrees that, at a minimum, there is a genuine issue of material fact whether Falk had reasonable suspicion to stop Plaintiff. First, the Wayne County Circuit Court judge's conclusions support this finding as it relates to Falk. Second, in a light most favorable to Plaintiff, the Court finds that Falk knew that Plaintiff and his friends had completed their purchase at the Canton Walmart without incident and that they had not engaged in any legal activity since the surveillance began. (*See, e.g.*, Dkt. No. 46, Ex. G at 17) Third, unlike the officers in *Hardesty* and *Lyons*, there is evidence that Falk was not acting "solely based on [McKinley's] request" to make the stop. Falk had heard McAteer's radio contact with the officers outside the Canton

Walmart and knew that Plaintiff and his friends had gone through the checkout and paid for the items in their cart.  Based on that knowledge, Falk had knowledge of Plaintiff's (legal) activities, and Falk independently had the ability to determine that there was no reasonable suspicion to justify a stop of Plaintiff.

The Court concludes that there is a genuine dispute of material fact whether Falk had reasonable suspicion to stop and seize Plaintiff and his friends, in violation of Plaintiff's Fourteenth Amendment rights.

## B.    Fourteenth Amendment Claims

Plaintiff alleges that he and his friends were targeted, scrutinized, and stopped by the SOU officers and Falk because they are black.  Defendants contend that race played no factor in the decision to investigate and stop Plaintiff.  In order to prevail on an Equal Protection claim, a plaintiff must demonstrate that "a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Henry v. Metro Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990).  A plaintiff must prove by "direct, circumstantial, or statistical evidence, that he was a target of racial profiling." *United States v. Saucedo*, 226 F.3d 782, 290 (6th Cir. 2000), *cert. denied*, 531 U.S. 1102 (2001).  A plaintiff may "demonstrate discriminatory effect . . . through the use of statistical evidence or other evidence which address[es] the crucial question of whether one class is being treated differently from another class

25

that is similarly situated." *Farm Labor Org. v. Ohio State Hwy. Patrol*, 308 F.3d 523, 534 (6 th Cir. 2002); *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005).

Plaintiff bases his equal protection argument against all officers on several things: (a) systemic racism in law enforcement is "undeniable" and "is especially true in mostly white communities with mostly white police departments . . . such as Livonia and Canton;" (b) Canton is 83.7% white and 4.54% black and Livonia is 92% white and 3.4% black; (c) only three of Canton's 87 officers were black and only 1 out of approximately 100 Livonia officers was black; (d) for five year periods between 2010 and 2015, 34% of the arrests were of blacks in Canton and 53% of the arrests in Livonia were of blacks; (e) over 45% of the arrests by Canton police for "obstructing police" and "obstructing justice" were of blacks; and (f) the number of arrests of blacks in Livonia is more than three times the number of black residents of Livonia.

Plaintiff contends those factors, together with the absence of reasonable suspicion to stop Plaintiff and his friends, whom McKinley and Falk knew had not committed a crime, in order to gather "intelligence" and an "explanation" as to why they were shopping permits an inference that Defendants had a discriminatory purpose. Plaintiff suggest that, viewing the totality of the circumstances, the white police officers presumed that the three black males were engaged in criminal conduct when they were not, such that there is a jury issue on this claim.

1.    *SOU Officers*

Defendants argue that there is no direct evidence of racial animus in this case, as no race-based comments were made by anyone, and Plaintiff concedes there was no rudeness.  Defendants argue that Plaintiff is making assumptions that he was stopped because he is black, without any evidence to support that assumption. Defendants indicate that it was the condition of the minivan, in light of the time of night, the weather, and the area crime history that prompted the initial scrutiny, and that McKinley ascertained before learning Plaintiff's race that there was "no record" of the temporary plate on the minivan being registered.

Plaintiff argues that McKinley knew that Plaintiff and his friends were black when Plaintiff was in Livonia. McKinley's testimony demonstrates that was possible, as he admits that the SOU officers saw the three black males leave the Meijer store, though he said only "possibly, you know, after they left the Meijer, but I can't say for sure." (Dkt. No. 39, Ex. B at 55) McKinley states that he knew "for sure that in Canton, I was solid there were three black males" there. *Id.*  Because none of the officers saw any criminal activity that evening, and there was a thought that the three men were part of a larger "crew" and a source of intelligence, Plaintiff concludes that it was their race that they were followed and seized as "suspicious."

The SOU officers argue that Plaintiff must show that: (1) he is a member of a

27

protected class (they agree he satisfies this prong); (2) who is similarly situated to members of another class; and (3) was treated differently from members of that other class. Citing *McMillan v. Svetanoff*, 878 F.2d 186, 189 (7th Cir. 1989).  The SOU officers argue that because Plaintiff has not shown that there are any similarly situated people who were treated differently, he has failed to satisfy the second and third prongs.  The Court finds that is not accurate, as Plaintiff has submitted a number of statistics that breakdown the race of persons in contact with Livonia (and Canton) police.

The SOU officers also argue that the statistics offered by Plaintiff, though they can aid in an indirect or circumstantial equal protection case, do not show any valid or relevant disparate impact here because the statistical sampling is not sufficiently defined and narrow to show discriminatory animus.  They argue that if there was an equal protection violation here, it was before any contact was made.

With respect to the SOU officers and Falk, the Court finds that there is a genuine dispute of material fact whether the investigation and stop and seizure of Plaintiff and his friends was based on their race.  In particular, McKinley's explanation for why he started following the minivan in the first place calls into question his motivation for following Plaintiff and his friends, especially as they did not stop the minivan once they learned of the "no record" plates.  The absence of any

28

evidence regarding the "no record" result of running the temporary plate and the suggestion of the SOU officers that they did not know the race of Plaintiff and his friends prior to the Canton Walmart also suggests that the SOU officers may not be forthcoming regarding the investigation and stop.

The SOU officers' motion for summary judgment is denied with respect to Plaintiff's equal protection claim.

### 2. *Falk*

Falk states that he did not know that Plaintiff (and his friends) were African-American until he arrived at the scene. (Dkt. No. 39, PgID 547; Ex. G at 11, 66) Eisnbeis did not identify the race of the men in the minivan to Canton dispatch (Dkt. No. 39, Ex. F), and Falk did not speak to a SOU officer (or anyone from Livonia) until Falk was at the Canton Walmart. (Dkt. No. 39, Ex. G at 11, 66) The only item that raises a question of whether Falk knew the race of the minivan occupants before reaching the Canton Walmart is his written report of the incident, which states, "While we were en-route I was advised that [the SOU officers] were following three black males inside the Canton store that they had been watching at one of their Livonia Walmarts." (Dkt. No. 39, Ex. I at 4)

Plaintiff also points to a statement made by Falk at his deposition:

Q.     If race played a part in your decision to make an arrest of somebody, would you admit that under oath?

29

> A.   No.

(Dkt. No. 47, Ex. F at 83) When questioned by his own attorney regarding this issue,

Falk then stated:

> Q.   I want to know – I want you to elaborate on what you think your answer meant, what you intended your answer to mean.  And I'm not leading you.
>
> A.   I understand. I think the reason I have a problem with that question is I feel like he's saying that I am lying about that, that race did not have a factor in this, in this situation.
>
> Q.   Is that what you intended your answer to be, when you said you would not admit?
>
> A.   Yeah, I mean if that would – I guess if that question was asked of me on the stand and race was a factor, then I would say yes.  I'm not perjuring myself."

*Id.* at 86 (*see generally* 83-86).  Plaintiff suggests that Falk's failure to belt Plaintiff

in the squad car after the arrest and Falk's driving in a manner that caused Plaintiff to

hit his head and see stars shows a disregard for Plaintiff's safety (presumably because

he is black).

Falk argues that Plaintiff fails to "prove the decision makers in his case acted

with discriminatory purpose," as he must do to prevail on his Equal Protection claim.

*McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).  Falk argues that the Canton dispatcher

would not have known the race of the men to relay to Falk, so he could not have

known (his report notwithstanding).  Falk argues that it was not within his discretion

30

whether to make contact with the three men–he was instructed to do so–so he could not have factored Plaintiff's race into whether to stop Plaintiff or not.  Falk also challenges the statistics offered by Plaintiff, stating that there is not a logical leap to use the statistics to demonstrate that arrests of African-Americans lacked probable cause or reasonable suspicion or a defendant was acquitted.  Falk says the statistics do not support an assertion that his arrest must have been race-based, which is Plaintiff's burden. Citing *United States v. Avery*, 137 F.3d 343, 356 (6th Cir. 1997) ("Only in rare cases will a statistical pattern of discriminatory impact conclusively demonstrate a constitutional violation.").

Falk knew that the occupants of the minivan/the subjects inside the Canton Walmart were black no later than upon his arrival at the Canton Walmart – before he made contact.  As discussed above, there was an absence of reasonable suspicion to stop Plaintiff and his friends (looking at the facts in a light most favorable to Plaintiff). Falk's testimony regarding whether race played a factor also could support a finding that the fact that Plaintiff and his friends were black was one of the reasons they were under surveillance and Falk made the stop of the minivan. (Dkt. No. 47, Ex. F at 83-86).  For these reasons, the Court concludes that an inference that race was a factor in the stop of Plaintiff and his friends is reasonable.  The Court concludes that Falk is not entitled to summary judgment on Plaintiff's equal protection claim.

C.    **Qualified Immunity**

1.    *SOU Officers*

Defendants argue that they were entitled to be reasonably mistaken with regard to both the facts and the law under the circumstances of the evening in question, all of which rapidly unfolded. They argue that even if the "no record" report regarding the minivan's plate did not establish probable cause, the SOU officers were entitled to believe that the "no record" report was sufficient under M.C.L. 257.225. They also contend that, even if the circumstances did not give them grounds for reasonable suspicion to believe criminal activity was afoot, the officers were reasonably mistaken in believing it was. The SOU officers contend that Plaintiff's premise that they ordered Plaintiff seized simply to gather intelligence is misplaced.

Plaintiff counters that the contours of the Fourth Amendment requirements for a *Terry* stop are clearly established and that any reasonable officer would know that a stop absent reasonable suspicion based on objective and articulable facts violates the Fourth Amendment. Plaintiff continues, stating that the gathering of intelligence or an explanation for shopping is not a legitimate basis of seizing/stopping someone without more that speculation that they might commit a crime. Plaintiff argues that Defendants did not have reason to believe that he was committing a crime or was in the process of doing so.

32

The SOU officers also contend that Plaintiff must identify facts to show that their contact with him was driven by race-based considerations, which they suggest he has not done because the investigation began without knowledge of the race of Plaintiff or his friends.  They assert that Plaintiff would have to show that no reasonable officer would have continued the investigation upon the discovery of Plaintiff's race–something that the law does not require.

For the reasons set forth in Sections IV.A.1. and IV.B. above, the Court finds that the SOU officers are not entitled to qualified immunity.  The genuine dispute of material fact regarding whether race was a factor in the investigation and seizure of Plaintiff and his friends precludes a finding that a reasonable officer could believe that considering race as a factor would not violate clearly established statutory or constitutional rights of which a reasonable person would have known–that is, it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308.

### 2. *Falk*

Falk argues that, even if there is a determination that evidence could show a constitutional violation by Falk, he had reason to believe his conduct conformed to the law.  Falk states that it was reasonable to rely on the observations and instructions of the SOU officers who had Plaintiff under surveillance for a period prior to requesting

33

Falk's involvement. Falk maintains that, even if he was mistaken in this belief, this is the type of case is the reason that qualified immunity exists

Plaintiff responds that the collective knowledge doctrine, together with Falk's involvement, establishes that Falk knew Plaintiff: (1) was black; (2) had paid for the merchandise; (3) had not engaged in a "push out;" and (4) had not committed any crime. For these reasons, Plaintiff contends that Falk knew there was no reasonable suspicion to justify stopping Plaintiff.

For the reasons stated in Sections IV.A.2. and IV.B.2. above (namely, that Falk stated that race was a factor), the Court denies Falk qualified immunity. As with the SOU officers, the genuine dispute of material fact regarding whether race was a factor in the investigation and seizure of Plaintiff and his friends precludes a finding that a reasonable officer could believe that considering race as a factor would not violate clearly established statutory or constitutional rights of which a reasonable person would have known–that is, it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308.

## D.    Conspiracy

A claim for conspiracy under §1983 "must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will be sufficient to state such a claim." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th

34

Cir. 1987) (citations omitted). A civil conspiracy is "an agreement between two or more persons to injure another by unlawful action." *Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir. 2000). A plaintiff must show that there was "a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). Section 1985(3) prohibits a conspiracy "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." To establish this claim, "there must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

Plaintiff asserts that Falk and the SOU officers acted in concert to deprive Plaintiff of his clearly established constitutional rights. Plaintiff's argument on this claim is, essentially, limited to the arguments he made with respect to his Fourth and Fourteenth Amendment claims (in essence, no reasonable suspicion justified his seizure and race was a motivating factor in their decisions). Plaintiff's argument to support his conspiracy claim further offers only that: (1) Falk and the SOU officers were in constant communication with each other in the time leading up to his seizure and arrest; (2) "all of the Livonia officers acted in concert to deprive Plaintiff of his

clearly established constitutional rights," and (3) he "has alleged and produced evidence to establish that his race played a motivating factor in the decision to stop him."

1.    *SOU Officers*

The SOU officers did not address the conspiracy claim in their original brief. In their reply brief, the SOU officers argue that none of the necessary elements have been pled or argued and that the evidence does not support such a claim.  They also argue that, to the extent Plaintiff argues that they conspired amongst themselves (as page 19 of Plaintiff's response brief literally states), the intra-corporate conspiracy doctrine bars a conspiracy claim against them. *Upton v. City of Royal Oak*, 492 F. App'x 492, 506-07 (6th Cir. 2012).

2.    *Falk*

Falk argues that Plaintiff has failed as a matter of law to plead – or show – "with some degree of specificity and that [Plaintiff's] vague and conclusory allegations unsupported by material facts [do not] sufficient[ly] state such a claim. *Guiterrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) (citations omitted).  Falk argues that Plaintiff makes no reference to the nature of the conspiracy, what conversations took place between whom, or where or when such conspiratorial interaction occurred, to say nothing of evidence demonstrating the existence of an

agreement, plan or single objective amongst any of the Defendants. Citing *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1988) ("In the absence of any evidence that the defendants agreed to deprive plaintiff of his constitutional rights," dismissal of conspiracy claim was proper).

### 3.    Conclusion

Plaintiff's conspiracy claim is not well-pled or argued.  Plaintiff does not set forth any evidence that any of the Defendants agreed to take any action against Plaintiff that would deprive him of his constitutional rights.  At most, he states that the officers spoke to each other but offers no evidence of a plan or any general conspiratorial objective.  For that reason, Defendants' motions for summary judgment are granted with respect to the conspiracy claim.

### E.    Municipal Liability Claims

Plaintiff has alleged that both Livonia and Canton are liable for the unconstitutional practice of treating black citizens differently than white citizens.  A municipal defendant can only be subject to direct liability if it causes the constitutional harm because it "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by" that body's officers. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).   "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id*. at 694.  A plaintiff cannot allege a viable claim based solely on vicarious liability or *respondeat superior*. *Id*. at 691.  The municipality's policy (or absence of one) must be a "moving force" in the deprivation of the plaintiff's constitutional rights and such policy must have arisen from "deliberate indifference" to the rights of its citizens. *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).

Plaintiff's argument against Livonia consists of the following paragraph, which seemingly incorporates and relies on the statistics identified by Plaintiff:

> Here, Plaintiff has established a Fourth and Fourteenth Amendment violation. Plaintiff has produced documentary evidence to establish systemic institutional racism in the City of Livonia Police Department. What else could possibly explain why over one-half of all people arrested in Livonia over the past three years are black when they comprise only a tiny portion of the general populace? Accordingly, issues of fact preclude Defendants' motion for summary judgment.

(Dkt. No. 46, PgID 821) Plaintiff's argument against Canton is the same, except that the question posed is "What else could possibly explain the undisputed fact that over one-third of all people arrested in Canton over the past five years are black when they only comprise a tiny portion of the populace?"

Defendants argue that Plaintiff has failed to produce any facts demonstrating that Livonia or Canton has failed to train or supervise their employees or indicate any

38

custom, policy, or practice that served as the driving force behind the alleged constitutional violation. Defendants argue that there is no evidence of prior occurrences giving notice to them that they maintained inadequate practices. Plaintiff does not address this issue in its arguments regarding municipal liability, but Plaintiff included a footnote in its argument regarding its equal protection claim against Canton. Plaintiff stated, "Canton also received numerous citizen complaints of racial profiling and discrimination based on race. [Dkt. No. 47, Ex. U] Without exception, Canton summarily dismissed all of these grievances as unsupportable." (Dkt. No. 47, PgID 1119, n.8) One such grievance involved Falk with respect to a traffic stop on May 11, 2011.

Canton argues that its police training regularly includes race, diversity, and ethnicity training (7 occasions between March 2007 and November 2015), so there cannot be a showing of deliberate indifference. Canton also notes that Plaintiff admits that he has no information to suggest that Canton has a custom of racially profiling drivers. Livonia argues that the statistical information has no bearing on this issue because it does not identify or take into account the number of persons who come into Livonia for any number of reasons.

Plaintiff has not presented allegations, argument, or evidence (at least not that is connected) to support his claims of municipal liability against Livonia or Canton.

39

Plaintiff does not show that Livonia was on notice of racial profiling or discrimination by any of the SOU officers.  As a matter of law, a practice of deliberate indifference cannot be established with a single occurrence. *Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985).  Plaintiff's municipal liability claim must be dismissed as to, and summary judgment on that claim must be entered in favor of,  Livonia

Plaintiff has offered evidence that Canton had complaints of racial discrimination/profiling, including one instance involving Falk.  Canton also has presented evidence that it regularly trains its officers regarding race, diversity and ethnicity, which would suggest there is not deliberate indifference.  The Court finds that there is a genuine issue of material fact as to whether Canton is subject to municipal liability.  Canton's motion for summary judgment is denied.

## IV.   CONCLUSION

Accordingly,

IT IS ORDERED that the Motion for Summary Judgment filed by Livonia, McKinley, Eisenbeis, and McAteer [Dkt. No. 38] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Canton and Falk [Dkt. No. 39] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Plaintiff's cause of action against Livonia is

DISMISSED.

IT IS FURTHER ORDERED that Plaintiff's conspiracy claim is DISMISSED.

IT IS FURTHER ORDERED that all other claims remain before the Court.

IT IS ORDERED.


s/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated:  March 29, 2017




I hereby certify that a copy of the foregoing document was served upon counsel of record on March 29, 2017, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager